IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BLAIR COMMUNICATIONS, INC, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Civil Action No. 07-162 |
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL UNION NO.5, AFL-CIO, | ) ) ) ) Judge Kim R. Gibson |
| Defendant. | ) ) |

## OPINION AND ORDER OF COURT

This matter comes before the Court on the parties' cross motions for summary judgment, filed by the Plaintiff, Blair Communications Inc. ("Blair Communications") (Doc. No. 13), and Defendant, International Brotherhood of Electrical Workers, Local Union No. 5 ("IBEW") (Doc. No. 5). Pursuant to 29 U.S.C. § 185, Blair Communications seeks to vacate an award by the Labor-Management Committee, an entity authorized by the parties' contractual agreements to adjudicate certain disputes. The parties have filed statements of material facts, briefs and responses thereto, and thus the summary judgment motions are ripe for disposition. For the following reasons, this Court will grant Defendant's Motion and deny Plaintiff's Motion.

### I. Background

Unless otherwise indicated, the following material facts are undisputed.

Bob Stangl was the owner and operator of Stelco Electric Inc. ("SEI"), a union company performing electrical construction work named. Mr. Stangl founded Blair Communications, as a non-union company to perform services for voice-data-audio, audiovisual and other communication

1

systems. IBEW pursued a grievance against SEI, alleging that by founding and controlling Blair Communications, SEI violated the work preservation provision of the collective bargaining between IBEW and SEI. Upon receiving a favorable decision by the Labor-Management Committee ("Committee"), IBEW filed a federal lawsuit to enforce the Committee's decision against SEI; IBEW also joined Blair Communications as the alter ego and/or single employer of SEI. This lawsuit was settled by IBEW, SEI and Blair Communications; by the terms of the settlement, IBEW agreed to drop the lawsuit in exchange for Blair Communications becoming a signatory to the collective bargaining agreements. On June 12, 2001, Blair Communications executed letters of assent, authorizing the National Electrical Contractors Association to represent Blair Communications as its collective bargaining representative for all matters relating to current and future Inside and Residential labor collective bargaining agreements ("CBAs") between Blair Communications and the IBEW.

The 2003-2005 and 2006-2008 Inside and Residential CBAs contained grievance procedures that referred disputes to the Committee. On January 25, 2007, the IBEW filed a grievance against Blair Communications, alleging that Blair Business Communications ("BBC") was the alter ego and/or single employer of Blair Communications and that Blair Communications violated the work preservation provisions of the CBAs exercising control over BBC and diverting bargaining unit work. The work preservation provision of the Inside Construction Agreement states as follows:

> **Section 2.07 (a).** In order to protect and preserve, for the employees covered by this Agreement, all work heretofore performed by them, and in order to prevent any device or subterfuge to avoid the protection and preservation of such work, it is hereby agreed as follows: If and when the Employer shall perform any on-site construction work of the type covered by this Agreement, under its own name or under the name of another, as a corporation, company,

2

> partnership, or any other business entity including a joint venture, wherein the Employer, through its officers, directors, partners, or stockholders, exercises either directly or indirectly, management control or majority ownership, the terms and conditions of this Agreement shall be applicable to all such work. All charges or violations of this Section shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement covering the procedure for the handling of grievances and the final and binding resolution of disputes.

Doc. No. 6, ex. 6, p. 7; Doc. No. 6, ex. 7, p. 1. The work preservation agreement in the Residential Construction Agreement is the same as above. Doc. No. 6, ex. 7, pp. 6-7.

As provided for under the CBA, a hearing was held before the Committee. The Committee noted that Mr. Stangl's daughter, Jennifer Mallad, was the Vice President of Blair Communications. Ms. Mallad was unhappy with Blair Communications' status as a union company and consequently planned to start a new non-union company, BBC, along with Carl DeStefano, a manager at Blair Communications. Mr. DeStefano and Ms. Mallad held a meeting in fall, 2005, where they asked employees of Blair Communications to vote the union out; the employees refused. Thereafter, Ms. Mallad took a voluntary layoff from Blair Communications; however, she still came in periodically to oversee business. When customers called to request new accounts, Ms. Mallad would postpone such projects so as to have them performed by BBC, once it opened for business. Additionally, Mr. Stangl told Blair Communications' secretary that all new sales calls were to be forwarded to BBC. In January, 2006, work at Blair Communications slowly tapered off and employees were laid off. BBC initiated an advertising campaign indicating that they were selling the same phone systems as Blair Communications; at the time, Blair Communications was the only authorized dealer of such phone systems. Additionally, BBC's website stated that it was founded more than twenty years ago. Additionally, BBC advertised with Blair Communications' telephone number, and Blair

3

Communications paid BBC's telephone bill. Furthermore, BBC used Blair Communications's equipment and materials without any contract or transfer arrangement.

On May 14, 2007, the Committee issued a unanimous decision which include the following conclusions:

> (2) Both Bob Stangl, President of BCI, and his daughter Jen Mallad, Vice President of BCI [Blair Communications Inc.], intentionally siphoned BCI's bargaining unit work to BBC with the sole intent of evading the collective bargaining agreement with [the IBEW].
> (3) BCI violated the work preservation provisions and other provisions within the inside and residential collective bargaining agreements by performing bargaining unit work through another entity/joint venture to which its officers and/or principles exercised management control and/or majority ownership, namely through BBC.
> (4) BCI created BBC as its alter ego/single employer with specific intent to divert [the IBEW's] bargaining unit work and violate all of the provisions of the Inside and residential collective bargaining agreements.
> (5) BCI violated all of the provisions of the Inside and residential collective bargaining agreements by creating BBC as a subterfuge to avoid all of its obligations of the Inside and residential collective bargaining agreements.

Doc. No. 6, ex. 2, p. 4. Despite this decision, Blair Communications subsequently failed to comply with the remedies required by the Committee.

## II. Standard of Review

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding a summary judgment motion, the court must "view the evidence . . . through the prism of the substantive evidentiary burden" to determine "whether a jury could

reasonably find either that the plaintiff proved his case by the quality and quantity of the evidence required by the governing law or that he did not." *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 247 (3d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986)). However, the Court must examine the facts in the light most favorable to the non-moving party opposing the motion. *Int'l Raw Materials, Ltd. v. Stauffer Chem. Co.*, 898 F.2d 946, 949 (3d Cir. 1990).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255 (1986)).

## III. Analysis

When reviewing a decision by the labor-management committee, the Court gives great deference to the findings of the committee; decisions by such a committee are given the same level of deference given to that of an arbitration decision. *Eichleay Corp. v. Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers*, 944 F.2d 1047, 1056 (3d Cir. 1991)(citing *Griesmann v. Chem. Leaman Tank Lines, Inc.*, 776 F.2d 66, 74 (3d Cir. 1985)). Generally, a district court can only vacate the committee's decision if the decision does not draw its essence from the collective bargaining agreement. *United Steelworkers of Am. v. Enter. Wheel and Car Corp.*, 363 U.S. 593, 597 (1960); *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum and Plastic Workers of Am.*, 461 U.S. 757, 764 (1983). A decision by the committee draws its essence from the CBA if "its interpretation can *in any rational way* be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intentions." *Brentwood Med. Assocs. v. United Mine Workers of Am.*, 396 F.3d 237, 240 (3d Cir. 2005)(citing

5

*United Transp. Union Local 1589 v. Suburban Transit Corp.*, 51 F.3d 376, 379-80 (3d Cir. 1995))(emphasis in original). Therefore, a committee award is only vacated if "it is entirely unsupported by the record or if it reflects a 'manifest disregard' of the [collective bargaining] agreement." *Exxon Shipping Co. v. Exxon Seaman's Union*, 73 F.3d 1287, 1291 (3d Cir. 1996)(citing *News America Publ'ns., Inc. v. Newark Typographical Union, Local 103*, 918 F.2d 21, 24 (3d Cir. 1990)).

One exception to this general rule is where the award by the labor-management committee would violate a "well defined" and "explicit" public policy. *E. Associated Coal Corp. v. United Mine Workers of Am., District 17*, 531 U.S. 57, 62 (2000)(citing *W.R. Grace & Co.*, 461 U.S. at 776). Blair Communications argues that the work preservation agreement in the CBA violates the well defined public policy of Section 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e). Section 8(e) provides:

> It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible [sic] and void . . . .

29 U.S.C. § 158(e). The purpose of Section 8(e) is to invalidate "hot cargo" clauses that call for employees not to be required to handle "hot cargo" that is manufactured or related to another employer whom the union has a dispute. *Nat'l. Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 634 (1967).

Despite the broad language of Section 8(e), it has been interpreted as not prohibiting agreements made for "primary" purposes, such as work preservation agreements. *NLRB v.*

6

*Pipefitters*, 429 U.S. 507, 517 (1977)(citing *Nat'l. Woodwork*, 386 U.S. at 635). The determination of whether a work preservation agreement has been made for valid "primary" purposes is based on "whether under all the surrounding circumstances, the Union's objective was preservation of work for [the] employees, or whether [the agreements] were tactically calculated to satisfy union objectives elsewhere ... The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer vis-a-vis his own employees." *Nat'l Woodwork*, 386 U.S. at 644-45. In making this determination, the court looks to (1) whether the agreement has "as its objective the preservation of work traditionally performed by employees represented by the union" and (2) whether the employer has "the power to give the employees the work in question" i.e. the "right-of-control." *NLRB v. Int'l Longshoreman's Ass'n*, 447 U.S. 490, 504-05 (1980)("ILA I")(citing *Pipefitters*, 429 U.S. at 517).

The work preservation clauses at issue in this case are nearly identical to clauses that other courts, including the Sixth Circuit and the National Labor Relations Board, have held to not violate the public policy of Section 8(e). *Becker Electric Co. v. Int'l Bhd. of Elec. Workers*, 927 F.2d 895 (6th Cir. 1991); *NLRB v. Manganaro Corp.*, 321 NLRB 158 (1996); *NLRB v. Mfg. Woodworkers Ass'n of Greater N.Y.*, 326 NLRB 321 (1998). The type of work preservation clauses at issue in the three cited cases, and in the case *sub judice*, are known in the industry as "anti-double-breasting" clauses. A double-breasted or dual shop is where an "employer maintains one company that is a signatory to a CBA while maintaining a second, non-union company in the same line of work. Such a technique enables the employer to utilize non-union labor." *Becker Electric*, 927 F.2d at 896. The goal of an "anti-double-breasting" clause is to prevent the employer from transferring union work to the non-union side of a double-breasted employer; this is accomplished by essentially

7

treating the non-union side of the employer as a signatory to the CBA. The Board in *Manganaro* held that the treating the non-union side as a signatory did not violate the "right-of control" test from *ILA I* because the clause required the signatory to exercise "management, control, or majority ownership" and the exercise of that authority must be actual or active control of the work. *Manganaro*, 321 NLRB at 164. The Board in *Manufacturing Woodworkers* stated that "the crucial focus is whether . . . work of the type covered by the collective-bargaining agreement is being performed by a business entity over which the signatory employer exercises control." *Mfg. Woodworkers*, 326 NLRB at 325.

Blair Communications also challenges the factual basis of the Committee's conclusion that Blair Communications officers/principals exercised management control and/or majority ownership. Blair Communications states that none of the nineteen findings of fact by the Committee relate to the right of Blair Communications to control the work done by BBC. Blair Communications argues that since none of the findings can support that Blair Communications exercised control over the work of BBC, the application of the work preservation agreement without a valid finding of "right-of-control" results in the Committee's decision violating Section 8(e).

Upon review of the findings of fact by the Committee, this Court concludes that the Committee's decision has support in the record. For instance, the Committee found that Jennifer Mallad, Bob Stangl's daughter and Vice President of Blair Communications, planned to start BBC while working for Blair Communications, and "postponed the projects [of Blair Communications] so as to have them performed by BBC after it opened for business." Both findings indicate that Blair Communications had the power to give work to BBC employees. Doc. No. 6-2, ¶¶ 5-8. The Committee also found that Bob Stangl instructed Blair Communications' secretary to route all new

8

sales calls to BBC; this supports a finding of common management control over both Blair Communications and BBC. Doc. No. 6-2, ¶ 10. Finally, the Committee also found that Bob Stangl did not fully answer questions or provide requested information, including insurance information, payroll records and copies of agreements. *Id.* ¶ 19. The Committee found that this lack of cooperation merited an adverse inference that the requested information would have been harmful to Blair Communications's defense; this adverse inference provides further support to the Committee's ultimate conclusion. To that end, the Committee's conclusion as to "right-of-control" is supported by factual findings in the record.

Blair Communications additionally challenges the factual support of the Committee's findings that BBC was the alter ego/single employer of Blair Communications. This Court may only give an "exceedingly narrow" review to challenges to a labor-management committee's factual conclusions. *Eichleay Corp. v. Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers*, 944 F.2d 1047, 1047 (3d Cir. 1991). As stated above, the Committee's finding of common management and control was supported by the record. Additionally the Committee's findings that BBC shared the same website, logo, telephone number, and that BBC claimed to have had its inception twenty years ago, all supported the Committee's findings that BBC's actions essentially acknowledged its lack of distinction from Blair Communications. Doc. No. 6-2, ¶ 12. As a result, the Committee's conclusion is supported, appropriately drawing its essence from the record and the factual findings; therefore, the Committee's award will be enforced.

## IV. Attorney's Fees and Costs

IBEW raises in their motion that they are entitled to attorney's fees and costs for enforcing the Committee's decision as well as defending the action to vacate the award under the CBA. The

9

applicable provision of the CBA states as follows:

> (c). If as a result of violations of this Section, it is necessary for the Union and/or the Trustees of the joint trust funds to institute court action to enforce an award rendered in accordance with subsection (b) above, or to defend an action which seeks to vacate such award, the Employer shall pay any accountant's and attorney's fees incurred by the Union and/or Fund Trustees, plus cost of the litigation, which have resulted from the bringing of such court action.

Doc. No. 6-7, p. 1. The violation of the work preservation agreement, and the concomitant refusal to abide by the Committee's decision, forced IBEW to seek an enforcement action in this Court. Thus, the above CBA provision applies and attorneys' fees and costs shall be paid by Blair Communications.

## V. Conclusion

Since the Committee's conclusion can be rationally drawn from the agreement and their factual findings, the award must be enforced; consequently, IBEW's motion for summary judgment is granted and Blair Communications' motion for summary judgment is denied. An appropriate order follows.

AND NOW, this 26th day of March, 2009, after careful consideration, and for the reasons set forth in the accompanying Opinion, IT IS HEREBY ORDERED that the International Brotherhood of Electrical Workers, Local No. 5's Motion for Summary Judgment (Doc. No. 5) is GRANTED and Blair Communications Inc.'s Motion for Summary Judgment (Doc. No. 13) is DENIED. The Labor-Management Committee award in the action is AFFIRMED and is to be enforced. IT IS FURTHER ORDERED that Plaintiff shall pay Defendant's attorneys' fees and costs, pursuant to the parties' contractual agreement. Defendant shall file an itemization of such fees and costs on or before April 27, 2009. Plaintiff shall file a response to Defendant's itemization on or before May 11, 2009. Upon receipt and consideration of these filings, the Court shall issue an final Order regarding the payment of fees and costs.

**BY THE COURT:**

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**

11